Paul R. FARRELL, Appellant–
Respondent.,

v.

Teresa J. (Carter) LITTELL,
Appellee–Petitioner.

No. 03A01–0212–JV–493.

Court of Appeals of Indiana.

July 1, 2003.

Thomas J. Lantz, Ryan W. Redmon, Montgomery, Elsner & Pardieck, Seymour, IN, Attorneys for Appellant.

Jeffrey L. Beck, Beck Harrison & Dalmbert, Columbus, IN, Attorney for Appellee.

## OPINION

BAKER, Judge.

Appellant-respondent Paul R. Farrell appeals the juvenile court's order suspending his visitation with his five-year-old daughter T.F. Because the juvenile court did not make a specific finding that visitation would endanger T.F.'s physical health or well-being or significantly impair T.F.'s emotional development, we reverse the order's restriction on visitation.

Appellee-petitioner Teresa Littell cross-appeals,[1] claiming that the juvenile court erroneously excluded the opinions of two skilled witnesses. Because their opinions would not have been helpful, the juvenile court committed no error in excluding them.

### FACTS

Paul and Teresa are the parents of T.F., a girl born on May 20, 1997. Paul's paternity was established by a court order dated February 26, 1998. The court awarded Teresa custody of T.F. and granted Paul visitation. T.F. is hearing impaired and has speech difficulties because her mouth had not formed properly at birth. She also suffers from trachea malatia, a condition that required her to wear a tracheal tube to assist her breathing.

Because of her medical difficulties, T.F. required specialized care, monitoring, and treatment. Between December 1997 and June 2000, Sharon Bonta, an L.P.N., helped care for T.F. Bronta's replacement, nurse Fred Keplinger, began caring for T.F. sometime in 2000. At that time, T.F.

---

1. We deny Teresa's motion to strike Paul's Appellant's Appendix.

communicated through sign language. Keplinger understood about eight to ten percent of T.F.'s signs.

One morning in August 2000 as Keplinger was caring for T.F., she signed a message. Keplinger believed that T.F. was communicating that Farrell had molested her. This incident prompted Indiana State Police Detective Robert Bays, Jr. to begin investigating the allegations. He interviewed both Keplinger and Teresa. As part of his investigation, Detective Bays learned that T.F. had made similar allegations about Teresa and her new husband, Shawn Littell. After the investigation, Detective Bays compiled a police report, which contained summaries of interviews he had conducted with Keplinger and Teresa. He had arranged for an interview for T.F., but she would give no statement. Appellant's App. p. 29. The investigation was then closed and no criminal charges were filed.

In August 2001, Teresa informed Detective Bays that T.F. had made another statement indicating that Paul had sexually abused her. It appears from the record that T.F. made allegations concerning other people, but, according to Detective Bays, Paul's "name came up more than anybody during the investigation." Appellant's App. p. 31. Detective Bays interviewed Bonta, Teresa, Paul, and Paul's wife. His written report summarized their statements. In addition, Paul took two polygraph tests whose results were inconclusive. The 2001 investigation did not reveal any physical evidence that abuse had occurred and the investigation ceased. No charges were brought against Paul or anyone else.

At some point after the 2001 investigation, Teresa refused Paul his court-ordered visitation with T.F. On October 30, 2001, Paul filed a petition asking the court to find Teresa in contempt for refusing him visitation. The hearing on Paul's petition began on August 20, 2002, and the remainder of the hearing was held on September 26, 2002. Teresa's defense to barring Paul's visitation was that he had molested T.F.

Teresa offered testimony from several witnesses, including herself, about out-of-court statements T.F. had made to them. Paul objected to these statements as hearsay, and his objections were sustained. Detective Bays testified about statements third parties had made to him during the course of the investigation. The juvenile court admitted Detective Bay's testimony over Paul's objection for the limited purpose of establishing what the police had done during the investigation.

In addition, Detective Bay's police reports, prepared during his 2000 and 2001 investigations, were admitted into evidence over Paul's hearsay objection. These reports consisted of summaries of statements that third parties made to Detective Bays during the course of the investigation. Paul objected that the reports themselves were inadmissible hearsay and that the statements contained in the report were hearsay within hearsay. The juvenile court found that the reports were admissible under the business records exception to the hearsay rule but did not address Paul's hearsay-within-hearsay objection. T.F.'s statements to Keplinger, Teresa, and others were the only pieces of evidence admitted to show that Paul had molested T.F. At the close of the hearing, the juvenile court advised the parties that Paul would have no visitation with T.F. until the juvenile court entered its order even though the juvenile court acknowledged that there had been no prior order suspending or restricting Paul's visitation.

The juvenile court issued the following order on November 15, 2002, which stated in part:

1. The parties are the parents of [T.F.], born on May 20, 1997.

2. The parties stipulate that [Paul] has had no visitation with the minor child since August, 2001.

3. Beginning in September, 2000, Detective Robert L. Bays, Jr., with the Indiana State Police, investigated allegations of child molestation as to [T.F.] This investigation was supplemented with additional reported incidents and said investigation continued through September 5, 2001. The officer testified that in the course of the investigation, [Paul's] name "came up more often than not" from the child as being the perpetrator.

4. Sexualized behavior has been exhibited by the child and observed by several home health care providers for the child. The Court is very concerned about this sexualized behavior and the cause of this behavior. [Paul] adamantly denies having inappropriately touched the child. Consequently, the Court is left with uncertainty as to what the child has been exposed to or whether there has been any inappropriate sexual conduct with the child.

5. Based on the concerns set forth above, the Court finds that visitation between [Paul] and the minor child shall continue to be suspended. Prior to the reinstatement of any visitation, [Paul] shall undergo a full evaluation with [the] Indianapolis Institute for Families, which shall include a referral for a voice stress examination. [Paul] shall pay the examination expenses. [Teresa] and the minor child shall cooperate with this evaluation and shall participate in any requested interviews or meetings.

Appellant's App. p. 9–10. Paul now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

■■■ When, as here, the court enters findings and conclusions sua sponte, the specific findings only control as to the issues they cover, while a general judgment standard applies to any issue upon which the court has not found. *Bryant v. Bryant*, 693 N.E.2d 976, 977 (Ind.Ct.App. 1998), *trans. denied*. In reviewing the issues covered by specific findings, we must first determine whether the evidence supports the findings and, second, whether the findings support the judgment. *Id.* The judgment will be reversed only when clearly erroneous or contrary to law. *Id.* To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. *Id.* We will not reweigh the evidence or assess witness credibility. *Id.* As to issues not covered by specific findings, we may affirm the judgment on any theory supported by the evidence adduced at trial. *Id.*

### II. Lack of "Specific Findings"

■■■ Paul contends that the juvenile court erred in failing to make specific findings that visitation would endanger T.F.'s physical health or well-being or significantly impair T.F.'s emotional development. In addressing Paul's contention, we first note that a case involving child custody, support, or visitation that arises in the dissolution context may be instructive and authoritative in a case that arises in the paternity context, and vice-versa, to the extent that the case is not specifically affected by differences in the statutes relating to dissolution and paternity. *In re Paternity of K.J.L.*, 725 N.E.2d 155, 157

(Ind.Ct.App.2000). Under the paternity version of the modification statute, a court may modify a visitation order "whenever modification would serve the best interests of the child." Ind.Code § 31–14–14–2. A noncustodial parent is entitled to reasonable visitation rights, "unless the court finds, after a hearing, that visitation might":

(1) endanger the child's physical health and well-being; or

(2) significantly impair the child's emotional development.

Ind.Code § 31–14–14–1.

Even though section 31–14–14–1 uses the term "might," this court interprets the statute to mean that a court may not restrict visitation unless that visitation *would* endanger the child's physical health or well-being or significantly impair the child's emotional development. *See Stewart v. Stewart,* 521 N.E.2d 956, 960 n. 3 (Ind.Ct.App.1988) (interpreting predecessor to the divorce version of the modification statute), *trans. denied.* By "its plain language," Indiana Code section 31–14–14–1 requires a court to make a specific finding "of physical endangerment or emotional impairment prior to placing a restriction on the noncustodial parent's visitation." *In re Paternity of V.A.M.C.,* 768 N.E.2d 990, 1001 (Ind.Ct.App.) *(V.A.M.C. I)* (reversing court's restriction of visitation where court "did not specifically find" that child's emotional well-being or physical health would be endangered), *modified in part on reh'g,* 773 N.E.2d 359 (Ind.Ct.App. 2002) *(V.A.M.C. II).* A party who seeks to restrict a parent's visitation rights bears the burden of presenting evidence justifying such a restriction. *See Carmichael v. Siegel,* 754 N.E.2d 619, 636 (Ind.Ct.App. 2001).

The juvenile court, it is undisputed, did not make a specific finding that visitation would endanger T.F.'s physical health or well-being or significantly impair T.F.'s emotional development. As Teresa correctly points out, such an error does not automatically result in a reversal of the juvenile court's judgment. In the original *V.A.M.C.* opinion, a panel of the court held that a trial court's failure to make a specific finding—that visitation would harm the child—required reversal. *V.A.M.C. I,* 768 N.E.2d at 1001. Upon rehearing, the panel modified its original remedy:

[W]e grant rehearing for the limited purpose of remanding this cause to the trial court with instructions that on remand the trial court may either: (1) enter an order containing findings sufficient to support a visitation restriction under Ind.Code § 31–14–14–1 based on the evidence already on the Record, or (2) enter an order that does not contain a visitation restriction.

*V.A.M.C. II,* 773 N.E.2d at 360.

After considering the evidence in the instant case, the juvenile court was "left with uncertainty as to what the child has been exposed to or whether there has been inappropriate sexual conduct with the child." Appellant's App. p. 9. We fail to see how remanding the cause would help resolve the juvenile court's doubt. As *V.A.M.C. II* makes clear, the juvenile court could restrict visitation based only on the evidence in the record. 773 N.E.2d at 360. But, as the court's order shows here, it was the evidence in the record that produced such admitted uncertainty. For this reason, although reversal of the visitation restriction is warranted, remand for further findings is not.

This case illustrates the tension between protecting children from heinous sexual abuse and protecting innocent parents from the interruption and loss of parental rights, which almost inevitably accompanies a charge of sexual abuse—no matter

how loosely those charges are grounded in fact. In this case, there was no physical evidence that Paul had abused T.F. There was no testimony from T.F. that Paul had abused her. Paul himself, as the juvenile court noted in its order, adamantly denied abusing T.F. Moreover, Detective Bay's investigation indicated that T.F. had made statements implicating others, only Paul's name came up more often. We also note that the investigation began when Kepling-er, T.F.'s new home health care provider, who understood only eight to ten percent of T.F.'s sign language, said that T.F. had signed to him that Paul had abused her. The juvenile court excluded the statement from the record based on Paul's hearsay objection. No one, including Paul, had been arrested and charged with molesta-tion despite T.F.'s allegations. In short, the record would not have permitted a finding that Paul's visitation would endan-ger T.F.'s physical health or well-being or significantly impair T.F.'s emotional devel-opment.

### III. Teresa's Cross–Appeal

Teresa contends on cross-appeal that the trial court erred in excluding the opinions of Detective Bays and an OFC investigator that Paul was the person re-sponsible for T.F.'s sexualized behavior. She claims that both are skilled witnesses entitled to opine that Paul "was the perpe-trator." Appellee's Br. p. 22.

In a recent opinion, this court dis-tinguished between an expert witness and a skilled lay witness:

However, "[q]ualification under Rule 702 (and hence designation as an expert) is only required if the witness's opinion is based on information received from others pursuant to [Indiana Evidence] Rule 703 or on a hypothetical question." 13 Robert Lowell Miller, Jr., Indiana Evidence § 701.105 at 321 (2d 1995). The testimony of an observer, skilled in

an art or possessing knowledge beyond the ken of the average juror may be nothing more than a report of what the witness observed, and therefore, admis-sible as lay testimony. This type of evidence is not a matter of "scientific principles" governed by Indiana Evi-dence Rule 702(b); rather, it is a matter of the observations of persons with spe-cialized knowledge.

Such witnesses possessing specialized knowledge are often called skilled wit-nesses or skilled lay observers. A "skilled witness" is a person with "a degree of knowledge short of that suffi-cient to be declared an expert under Ind. Evid. Rule 702, but somewhat be-yond that possessed by the ordinary ju-rors." Mariscal [v. State, 687 N.E.2d 378, 380 (Ind.Ct.App.1997) ]. Skilled wit-nesses not only can testify about their observations, they can also testify to opinions or inferences that are based solely on facts within their own personal knowledge. In order to be admissible under Evidence Rule 701, opinion testi-mony of a skilled witness or lay observer must be "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Mariscal, 687 N.E.2d at 380 (quoting Ind. Evidence Rule 701).

Cansler v. Mills, 765 N.E.2d 698, 703 (Ind. Ct.App.2002) (alterations in original) (some citations omitted), trans. denied. So to render an admissible opinion, not only must the skilled witness have specialized knowledge beyond the ken of a lay juror, but he must also give testimony that is rationally based on his perception and tes-timony that is helpful to the factfinder.

While Detective Bays and the OFC in-vestigator may have a degree of knowl-edge somewhat beyond the ken of ordinary lay jurors given their respective occupa-

tions, their opinion regarding whether Paul had sexually abused T.F. would not have been helpful to the determination of a fact in issue. Teresa asserts that their opinions would "have given the trial court a better understanding of what had occurred or who did what." Appellee's Br. p. 24. Yet, Teresa fails to explain how their conclusion about Paul's ultimate responsibility would have helped the court. The court would be just as capable of reviewing and weighing the evidence presented to determine whether Paul had sexually abused T.F. Their opinion on Paul's responsibility is more akin to a vote of guilty than to helpful analysis. Thus, the trial court rightly excluded their opinions from evidence.

## CONCLUSION

In sum, the juvenile court did not make a specific finding that visitation would endanger T.F.'s physical health or well-being or significantly impair T.F.'s emotional development. Absent such a specific finding, the juvenile court did not have the authority to restrict Paul's visitation with T.F. Given the juvenile court's admitted and justifiable uncertainty regarding whether Paul abused T.F., there is no reason to remand this cause for further findings. The juvenile court correctly excluded Detective Bay's and the OFC investigator's opinions regarding Paul's ultimate responsibility for abusing T.F.

Judgment reversed.

SULLIVAN, J., and DARDEN, J., concur.