

IN THE

# Court of Appeals of Indiana

T.J.,

*Appellant-Respondent*

v.

J.J.,

*Appellee-Petitioner*



FILED

Oct 03 2025, 10:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

October 3, 2025

Court of Appeals Case No.
25A-DC-457

Appeal from the Hamilton Superior Court

The Honorable David K. Najjar, Judge

Trial Court Cause No.
29D05-2005-DC-3392

---

**Opinion by Judge Weissmann**
Judges Bailey and Brown concur.

**Weissmann, Judge.**

[1] When T.J. (Father) and J.J. (Mother) divorced in 2020, they agreed, and the dissolution court ordered, that they would share joint legal custody of their two young sons (Children) and that Mother would have primary physical custody of them subject to Father's regular parenting time. Father injured one child by throwing a toy in anger and on other occasions the parents disagreed about Children's medical treatment. Mother then sought to modify the dissolution decree. She requested sole legal custody of Children and restrictions on Father's parenting time. The dissolution court granted such relief, first through a preliminary order and then through a final judgment a year later. Father appeals, and we affirm, finding the trial court did not abuse its discretion in modifying legal and physical custody.

## Facts

[2] Mother and Father, who married in 2010, are the parents of M.J., born in 2016, and F.J., born in 2018. The 10-year marriage was dissolved through a *Mediated Waiver of Final Hearing, Decree of Dissolution of Marriage, Settlement Agreement and Judgment Entry* (Decree) in September 2020.

[3] The Decree specified that Mother and Father would have joint legal custody of Children and that Mother would have primary physical custody subject to Father's parenting time. Under the Decree, Father would pay child support of $165 weekly, as well as $150 weekly for work-related childcare expenses for the younger child. The Decree also noted that Mother and Father had opted against

vaccinating Children but that they would discuss future vaccinations upon request of either parent.

[4] Fourteen months after the Decree was entered, Mother petitioned for modification of custody and parenting time based, among other things, on her allegations that Father had improperly disciplined Children and left them alone while driving his girlfriend to work. Mother and Father resolved part of these issues through a mediated settlement, and Mother ultimately withdrew her remaining claims.

[5] In 2023, Mother became increasingly concerned about Father's behaviors and mental health. She alleged that Father sent her "bizarre and rambling messages," including one in which he stated that a religious sect had developed the COVID vaccine to "depopulate" the world. App. Vol. II, p. 11; Tr. Vol. II, p. 98. Mother believed Children were harmed by Father's sharing of his views with Children. Twice when one child needed emergency medical care, Father declined the treatment that the physicians recommended and that Mother endorsed based on Father's own research of medical issues on the internet.

[6] In one instance, Father declined oral antibiotics to prevent infection when one child was scratched by Father's rooster. Father told the physician that he would agree to the medication only if the child's bloodwork was already abnormal. The physician warned that if the child were not treated until after the infection progressed, the child's condition could deteriorate quickly. In the other instance, Father disallowed a chest x-ray and oral antibiotics for the child after

the child was taken to the emergency room with a respiratory infection. Because the parties shared legal custody at the time and could not agree, the child did not receive the treatment recommended by the attending physicians. Father also refused to allow Children to drink from their paternal grandmother's water bottle because she had been vaccinated and he feared Children would be adversely affected by her vaccinations through her saliva. Father also had criticized the paternal grandmother for giving one of the children Tylenol.

[7] On a different occasion, Father placed a bottle of potassium iodide in one child's jacket "to prevent radiation poisoning which enters into your thyroid and eats away all your internal organs and skin . . . like the Chernobyl movie where the guys are in the hospital dying horrendous deaths." App. Vol. II, p. 8. Father then advised Mother that "there will be a blackout of all communications, likely electrical/gas, and internet in the not too distant future." *Id.* at 9. Father asked Mother to bring Children to his home "[w]hen this happens . . . since we've been preparing for all of this for the last two years." *Id.*

[8] In early December 2023, Mother filed an emergency petition to modify Father's parenting time. She also petitioned for a protective order against Father, alleging he injured their child after becoming angry and throwing a toy that hit the child near his eye. When the child next reported to school with a black eye from the incident, the school reported the injury to the Indiana Department of Child Services, which thereafter investigated.

A week after Mother's emergency filings, the trial court conducted a hearing and entered a preliminary order denying the protective order. But the court restricted Father's parenting time to "up to four (4) hours per week supervised at an agency such as Kids Voice or Neutral Grounds at [Father's] expense." *Id.* at 13. The court also preliminarily granted Mother temporary sole legal custody of Children and recommended Father undergo a mental health evaluation. The preliminary order further provided "[t]hat unless modified herein[,] all other orders shall remain in full force and effect." *Id.*

Father, who represented himself throughout the modification proceedings, opted not to schedule the supervised parenting time because he viewed supervision at the facility as traumatic for Children and stigmatizing for him. As a result, Father did not exercise any parenting time after December 2023 through the date of briefing in this appeal. He also opted to forgo the mental health evaluation recommended by the court.

Although Mother had temporary sole legal custody, Father continued to instruct Mother as to which medical treatments Children should receive. For instance, he told her to not allow Children to receive fluoride treatments at their regular dental checkup in January 2024 and gave her materials from the internet that he claimed supported his position. Mother proceeded with the fluoride treatments.

Shortly after the preliminary order was entered, Father persuaded Mother to allow him to speak at length with Children by telephone, although the

preliminary order allowed only supervised parenting time. Mother eventually halted the calls, however, when Father discussed what she viewed as age-inappropriate topics with Children (then 4 and 6) including transgenderism and the assassination of President John F. Kennedy. Father thereafter sought clarification from the court as to his ability to communicate with Children. In February 2024, the trial court clarified that in light of its recommendation that Father undergo a mental health evaluation and its finding that Children's mental and emotional wellbeing would be significantly impaired unless Father's parenting time was restricted, Father was not permitted to communicate with Children outside of his supervised parenting time.

[13] The trial court denied Father's repeated requests that the court stay or otherwise not implement the preliminary order. At a review hearing in April 2024, Father defended his decisions to reject recommended medical treatments for Children. He testified that "[t]he medical decisions I made were based on me having medical knowledge" and that Mother's decision-making was wrong because she was "uninformed." Tr. Vol. II, pp. 161-162. Father also testified:

> I know that I wasn't in the wrong. I know that I protected my children from having antimicrobial resistance, any kind of negative drug risks that were being pushed on him as a result of medical child abuse which is established. It's—and the reality of the people who are attacking me is based off of being uninformed about these risks.

*Id.* at 162.

[14]     Shortly after the review hearing concluded, the court entered an order finding that the emergency had not been remedied and that the restrictions on Father's parenting time and custodial decision-making should continue. The court ordered that "[o]nce Father has engaged in supervised parenting time for a period of at least 90 days, or upon a showing of a substantial change in circumstances, any party may request a further review hearing to determine if the restrictions should be modified or terminated." App. Vol. II, p. 21.

[15]     The trial court later permitted the State to intervene on the child support issue. Mother, through her counsel, then petitioned for modification of child support, for contempt for Father's failure to meet his child support and other financial obligations specified in the Decree, and for modification of the Decree to allow Mother to claim the tax exemptions for the children annually. Two days later, Father petitioned to enforce the Decree's provision regarding vaccinations that specified Mother and Father initially opted against vaccinating Children but would discuss future vaccinations upon request of either parent.

[16]     Then, in September 2024—10 months after the emergency hearing—Father sought to reopen the evidence presented at that hearing, though a final hearing was scheduled later that month. He claimed he had insufficient time to prepare for the emergency hearing in December 2023. The trial court denied Father's motion without a hearing.

[17]     The court proceeded on September 26, 2024, to conduct the first of two final hearings. Mother testified that although she initially had agreed not to vaccinate

Children, she now believed some vaccinations were necessary. She agreed to inform Father if Children were vaccinated. Father continued to express opposition to any vaccines, confidence in his own medical decision-making, and a belief that Mother was uninformed on such issues.

[18] The court continued the final hearing to December 9, 2024, in an order denying Father's petition to enforce the vaccination provisions in the Decree. Viewing Father's petition as "a gross misunderstanding of the Court's orders," the court rejected Father's view that the vaccination provisions in the Decree remained enforceable after the trial court granted Mother legal custody of Children in December 2023. *Id.* at 30. The court clarified that Mother, as Children's temporary sole legal custodian, had the authority to make all medical decisions for Children including those involving vaccinations.

[19] The order further provided:

> The Court would remind the parties, and Respondent in particular, that this Court's recommendation of a mental health examination for Respondent remains. This Court's authority to review and reconsider whether an emergency exists also remains. Respondent, however, has done nothing to alleviate the Court's concerns. Respondent, further, has done nothing to demonstrate that he is capable of engaging in productive parenting time with the children, having refused to engage in supervised parenting time. Respondent has, instead, invested his time and efforts into schooling himself as an amateur lawyer and an amateur physician. He is welcome to do so. But such efforts do not persuade this Court of his ability to effectively parent the children or to effectively communicate with Petitioner and co-parent in a way that furthers the best interests of the children.

*Id.* at 30-31.

[20] At the second final hearing in December, Mother testified that joint legal custody was untenable because Father reacted hostilely to any opposition to his views. She was concerned about his mental state, given the nature of some of his writings to her. Mother also testified that they disagreed as to the topics that should be discussed with Children.

[21] Father testified that he had not engaged in the supervised visitation ordered a year earlier because "I'm not going to give this court additional information to use against me from some person who doesn't know me or the kids, to be used as fodder to justify a decision that should never have been made against me in the first place." Tr. Vol. III, p. 12. He also stated: "Same thing goes for the psychological evaluation[,] and I do not want my kids to have to go through that experience and seeing me being babysat by somebody they don't know because they think that Dad did something wrong." *Id.* Later, Father testified: "I'm not going to follow these requirements to see my kids." *Id.* at 15.

[22] In January 2025, the trial court issued its final order, accompanied by findings of fact and conclusions of law. It granted Mother's requests for sole legal custody and for restrictions on Father's parenting time, permitting Father up to 4 hours weekly of parenting time, to be supervised by a "professional agency." App. Vol. II, p. 72. The court specified that Father would be responsible "for setting up the supervision and for all costs of the supervision." *Id.* at 67. The court also increased Father's child support obligation, granted Mother the tax

exemptions for Children, and denied Mother's requests to hold Father in contempt and for attorney fees. Father appeals.

## Discussion and Decision

[23] Father challenges the trial court's modifications of legal custody and parenting time. When, as here, a trial court enters findings of fact and conclusions of law under Indiana Trial Rule 52(A), we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then consider whether the findings support the judgment. *Hurst v. Smith*, 192 N.E.3d 233, 242 (Ind. Ct. App. 2022). The trial court's findings and conclusions will be set aside only if they are "clearly erroneous"—that is, "if the record contains no facts or inferences supporting the judgment." *Id.* "A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made." *Id.* In conducting this review, "we neither reweigh the evidence nor assess the credibility of the witnesses but consider only the evidence most favorable to the judgment." *Id.*

[24] Guiding our review is the "well-established preference in Indiana 'for granting latitude and deference to our trial judges in family law matters.'" *Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016) (quoting *In re Marriage of Richardson*, 622 N.E.2d 178 (Ind. 1993)). "Appellate courts 'are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came

from the witness stand, did not properly understand the significance of the evidence.'" *Id.* (quoting *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002)).

[25] We also note that Father represents himself on appeal, and Mother has not filed an appellee's brief. The former circumstance does not impact the standard of review, but the second does. Father is "held to the same legal standards as licensed attorneys" so his pro se status garners no special consideration. *Basic v. Amouri*, 58 N.E.3d 980, 983-84 (Ind. Ct. App. 2016). "[P]ro se litigants are bound to follow the established rules of procedure and must be prepared to accept the consequences of their failure to do so." *Id.*

[26] But where, as here, no appellee's brief is filed, the appellant need only prove prima facie error to prevail on appeal. *Salyer v. Washington Regular Baptist Church Cemetery*, 141 N.E.3d 384, 386 (Ind. 2020). "Prima facie error in this context means 'at first sight, on first appearance, or on the face of it.'" *Id.* (quoting *Front Row Motors, LLC v. Jones*, 5 N.E.3d 753, 758 (Ind. 2014)). Although we will not undertake to make arguments on behalf of the absent appellee, we remain obligated to reach the correct result dictated by the law and facts. *Jenkins v. Jenkins*, 17 N.E.3d 350, 352 (Ind. Ct. App. 2014). Under this standard, we conclude that Father has not established prima facie error. Accordingly, we affirm.

## I. The Trial Court Did Not Violate Father's Right to Due Process by Admitting Exhibits 1-10 or in Denying Father's Motion to Correct Error

[27] Father claims that the trial court's admission "of [Mother's] eight late-filed exhibits and denial of Father's Motion to Correct Error violated [Father's] Fourteenth Amendment due process rights by depriving him of a fair opportunity to challenge evidence and present rebuttal evidence critical to the January 28, 2025, Final Judgment." Appellant's Br., p. 24.

[28] Father has waived this due process claim in several ways.[1] First, Father failed to object on due process grounds to the admission of the exhibits that he now challenges on appeal. *See Dennerline v. Atterholt*, 886 N.E.2d 582, 594 (Ind. Ct. App. 2008) (finding waiver under similar circumstances based partly on the long-standing rule that a party cannot argue on appeal an issue not properly presented to the trial court).

[29] Second, Father's motion to correct error was not timely filed. A motion to correct error, "if any, must be filed not later than thirty (30) days after the entry of a final judgment is noted in the Chronological Case Summary." Indiana Trial Rule 59(C). Father's motion to correct error was filed January 17, 2024— after the emergency hearing and preliminary order but a year before the trial court entered final judgment. Father's motion to correct error filed in response

---

[1] Father repeatedly refers to the trial court judge solely by the judge's last name. Father is advised in any future appellate filings to refer to the judge as judge, court, trial court, or "Judge [last name]."

to an interlocutory order "is ineffective for any purpose." *Murray v. Murray*, 309 N.E.2d 831, 832 (1974) (decided under prior version of appellate rules that required the filing of a motion to correct error after a final judgment as a prerequisite to appeal).

[30] Third, Father has not recited the legal standard by which due process violations are determined. Nor has he provided any argument as to why that standard was met here. Father therefore has waived this claim by failing to provide cogent argument. *See Lowrance v. State*, 64 N.E.3d 935, 938 (Ind. Ct. App. 2016) ("We will not become an 'advocate for a party, or address arguments that are inappropriate or are too poorly developed or expressed to be understood.'") (quoting *Perry v. Anonymous Physician 1*, 25 N.E.3d 103, 105 n.1 (Ind. Ct. App. 2014)); *see also* Ind. Appellate Rule 46(A)(8)(a)-(b) (specifying the required contents of an appellant's brief include relevant analysis and citation to supporting authority).

[31] In any case, the exhibits that Father references were admitted during the emergency hearing on December 15, 2023, that resulted in the preliminary order. In his motion to correct error filed in response to the preliminary order, Father essentially sought to supplement or refute Mother's evidence presented at the emergency hearing. Although the trial court denied Father's motion to correct error, he had the opportunity at three subsequent hearings—the review hearing in April 2024 and the two final hearings in September and December 2024—to supplement or refute the exhibits that Mother admitted at the emergency hearing on December 15, 2023. Father, in fact, seized that

opportunity, although the trial court determined some of the evidence he introduced was inadmissible. All these hearings occurred before the court's final judgment.

[32] Given these opportunities for Father to present the additional evidence that he claims he was unable to introduce at the emergency hearing, the trial court did not deny Father "a fair opportunity to challenge evidence and present rebuttal evidence critical to the January 28, 2025, Final Judgment." Appellant's Br., p. 24.

## II. The Trial Court Did Not Abuse Its Discretion in Modifying Legal Custody and Parenting Time

[33] Father next contends the trial court erred in modifying legal custody and restricting his parenting time. He argues that the trial court's findings in support of Mother's sole legal custody are deficient and that the trial court erroneously restricted his parenting time based on Father's religion-based discussions with Children without any showing of harm.

[34] We review custody modifications for an abuse of discretion "with a preference for granting latitude and deference to our trial judges in family law matters." *Hecht v. Hecht*, 142 N.E.3d 1022, 1028 (Ind. Ct. App. 2020) (quoting *Werner v. Werner*, 946 N.E.2d 1233, 1244 (Ind. Ct. App. 2011)). Parenting time modifications likewise are reviewed under an abuse of discretion standard. *Maw v. Pringle*, 263 N.E.3d 790, 792 (Ind. Ct. App. 2025). We affirm the trial court's modification of both legal custody and parenting time.

## A.    Legal Custody

[35]    A court may not modify a legal custody order unless "the modification is in the best interests of the child" and "there is a substantial change in one (1) or more of the [statutory] factors that the court may consider." Ind. Code § 31-17-2-21(a). In determining whether an award of joint legal custody is in the best interests of the child, the court considers the following factors:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
>> (A) the child's parent or parents;
>>
>> (B) the child's sibling; and
>>
>> (C) any other person who may significantly affect the child's best interests.
>
> (5) The child's adjustment to the child's:
>
>> (A) home;
>>
>> (B) school; and
>>
>> (C) community.
>
> (6) The mental and physical health of all individuals involved.
>
> (7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

(9) A designation in a power of attorney of:

(A) the child's parent; or

(B) a person found to be a de facto custodian of the child.

Ind. Code §§ 31-17-2-8, -21(b).

[36] Father contends that the trial court's legal custody determination is not supported by valid findings establishing a substantial change in circumstances or that the modification was in Children's best interests. He claims the court's relevant findings "rely on speculative allegations[] and late-filed exhibits [that] prejudiced Father's pro se defense, rendering the modification an abuse of discretion." Appellant's Br., p. 15.

[37] Father particularly challenges the trial court's findings that suggest Father's views, especially on medical issues, are "fringe." App. Vol. II, pp. 63, 71. He argues the trial court violated his rights under the First Amendment and Fourteenth Amendment to the United States Constitution by basing its legal custody decision partly on findings relating to his religious beliefs.

[38] We already have found that Father waived any error in, or suffered no prejudice from, the admission of the allegedly late-filed exhibits. We need not address Father's remaining constitutional claims because even if we set aside

the trial court's findings about Father's religious views, the remaining findings support the trial court's modification of legal custody.

[39] The trial court's findings focused on the parties' inability, as joint legal custodians, to reach consensus on matters relating to Children. Joint legal custody requires "that the persons awarded joint custody . . . share authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training." Ind. Code § 31-9-2-67. "[T]he trial court decides 'whether the parents have the ability to work together for the best interests of their children.'" *Pilkington v. Pilkington*, 227 N.E.3d 885, 897 (Ind. Ct. App. 2024) (quoting *Arms v. Arms*, 803 N.E.2d 1201-10 (Ind. Ct. App. 2004)). Joint custody is inappropriate when "the parties have made child-rearing a battleground." *Id.* (quoting *Periquet-Febres v. Febres*, 659 N.E.2d 602, 605 (Ind. Ct. App. 1995)).

[40] Here, the court found that Mother and Father disagreed on medical treatment in two situations when doctors recommended a course of treatment including oral antibiotics, which Father opposed. The findings reflect that Mother and Father also disagreed generally as to vaccinations, with Mother favoring some vaccinations and Father opposing all.

[41] The court also noted Mother's testimony that her disagreement with Father's views was "met with hostility" and that "co-parenting with Father is extremely difficult." App. Vol. II, pp. 62-63. And the court found that Mother objected to Father discussing certain topics with Children that she deemed inappropriate

for their young age. *Id.* at 63. The trial court also found that "Father discounts and disregards the opinions of others if those opinions are not those that he himself shares" and "[w]hen Mother expresses different opinions, and her views are not given validity, co-parenting is impossible." *Id.* at 66.

[42] Father acknowledges these disagreements, although he views his position as correct and attributes the conflict to Mother being uninformed. Father's arguments on appeal reflect his continued disagreement with the trial court's assessment of the parties' ability to cooperate. To the extent Father challenges the trial court's findings as unsupported by the evidence, such challenges constitute a request for this Court to reweigh the evidence, which we cannot do on appeal. *See Steele-Giri,* 51 N.E.3d at 124 ("Appellate judges are not to reweigh the evidence nor reassess witness credibility.") (quoting *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011)). The record contains sufficient evidence to support the trial court's findings regarding legal custody. These findings, in turn, support the trial court's judgment awarding Mother sole legal custody. The court concluded:

> 54. It is in the best interests of the children that Mother have sole legal custody over the children, [and that she be] empowered to make decisions for the best interest of the children in all important matters, including health and medical decisions, education, and religious upbringing. This shall be without exception and shall necessarily include decisions about whether to vaccinate the children for various diseases and/or viruses.

***

77. Despite their prior agreement to exercise joint legal custody, the parties now are not willing or able to communicate [or] exercise joint legal custody, [and] the parties now are not willing or able to communicate or cooperate in advancing the child's [sic] welfare.

78. The Court cannot find that the children have established a close and beneficial relationship with Father as he has been voluntarily absent from their lives for at least a year.

79. The Court also has significant concerns regarding the fitness and suitability of Father to exercise joint legal custody.

80. These factors weigh heavily against an award of joint legal custody.

81. An application of these factors as well as the reality that Mother is the primary physical custodian weigh heavily in favor of Mother being awarded sole legal custody. Indeed, the children are with Mother exclusively due to Father's refusal to participate in parenting time.

*Id.* at 67, 70-71.

[43]     Given that the parties could no longer agree on matters central to Children's welfare—including whether they should exercise joint legal custody—and had great difficulty cooperating with each other, the trial court did not err in concluding a substantial change of circumstances existed. And the trial court's conclusion that Mother would be the better choice as legal custodian also was justified by its findings, particularly considering that Mother had been Children's sole caretaker for the past year due to Father's refusal to exercise

supervised parenting time. For these reasons, Father's challenge to the modification of legal custody fails.

[44] This disposition also resolves Father's alternate contention that granting Mother sole legal custody—including control over medical decisions for Children—violates the terms of the Decree. Mother successfully petitioned to modify the Decree's provision of joint legal custody. As we have determined, such modification is countenanced by Indiana Code § 31-17-2-21(a) and justified by the trial court's findings and conclusions. This ruling left Mother in sole control of medical decision-making for Children. Ind. Code § 31-17-2-17(a) ("the [legal] custodian may determine the child's upbringing, including the child's education, health care, and religious training"). Accordingly, Father's claim of a conflict between the legal custody modification and the Decree is unavailing.

## B.   Parenting Time Restrictions

[45] "Indiana has long recognized that the rights of parents to visit their children is a precious privilege that should be enjoyed by noncustodial parents." *Duncan v. Duncan*, 843 N.E.2d 966, 969 (Ind. Ct. App. 2006). A trial court "may modify an order granting or denying parenting time rights whenever modification would serve the bests interests of the child." Ind. Code § 31-17-4-2. But the court "shall not restrict a parent's parenting time rights unless [it] finds that the parenting time might endanger the child's physical health or significantly impair the child's emotional development." *Id.* This statutory provision has

been interpreted as barring parenting time restrictions "unless that visitation *would* endanger the child's physical health or emotional development." *Duncan*, 843 N.E.2d at 969.

[46] Father claims the trial court erroneously restricted his parenting time to four hours per week of supervised visits. He asserts the trial court violated his First Amendment and Fourteenth Amendment rights by basing this decision partly on findings relating to his religious beliefs. But again, even if we disregard the trial court's findings as to Father's religious beliefs, the remaining findings sufficiently support the trial court's judgment restricting Father's parenting time.

[47] The trial court found that one of the children reported being injured during a two-day visit with Father when Father became angry and threw a toy that struck the child, who suffered a black eye. The court further found that a teacher reported the child's injury to authorities. The court was justifiably concerned about Father exercising unsupervised parenting time after Father's expression of anger resulted in injury to the child. As the court found, Father took no action afterward that increased the court's confidence that unsupervised visitation was safe for Children.

[48] The court also found that Father had refused to exercise his supervised parenting time, meaning that he had not seen Children for a year. Father also failed to undergo the recommended mental health evaluation—an assessment

that presumably could have helped the court to determine whether Children would be safe in Father's unsupervised care or whether continued outbursts, like the one that injured child, were possible. Finally, the court found that Father's expression of his "fringe" views on medicine to Children "can be and is harmful to them and to their psychological and emotional well-being." App. Vol. II, p. 64. The court also determined that Father "engaged in a pattern of denying standard medical care to the children, exposed the children to fringe . . . medical views . . . that endanger the physical health of the children and significantly impair the emotional development of the children." *Id.* at 71.

[49] As with the court's findings on legal custody, Father's challenges to the non-religious-based findings regarding parenting time are merely a request to reweigh the evidence. These findings, which are based on evidence in the record such as Father's own statements, support the trial court's conclusions that Father's behavior constituted a substantial change in circumstances justifying modification of Father's parenting time to four hours per week at a supervision facility.

[50] The trial court's order does not preclude Father from seeking modification of his parenting time in the future. Should Father choose to participate in supervised parenting time and demonstrate that circumstances have changed, he may petition the court for expanded parenting time. Based on our standard of review and the record before us, however, we cannot conclude that the trial court erred in implementing the current restrictions on Father's parenting time.

We affirm the trial court's judgment.

Bailey, J., and Brown, J., concur.

APPELLANT PRO SE
T.J.
Noblesville, Indiana